No. 87-336

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

_____

IN RE THE MARRIAGE OF
ANDREW DEVON STEPHENSON,

        Petitioner and Respondent,

   and

SANDRA MOREY STEPHENSON,

        Respondent and Appellant.

_____

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable John McCarvel, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Smith, Baillie & Walsh; Robert J. Vermillion, Great
        Falls, Montana

    For Respondent:

        Michael Smartt, Great Falls, Montana

_____

Submitted on Briefs: Nov. 24, 1987

Decided: February 29, 1988

Filed: FEB 2 9 1988

_____

Clerk

Mr. Justice R. C. McDonough delivered the Opinion of the Court.

The parties' marriage was dissolved by decree of dissolution pursuant to a stipulation in the Court of the Eighth Judicial District, in and for the County of Cascade, on June 19, 1986. At the time of these proceedings the husband, Andrew, was represented by Michael S. Smartt, and the wife, Sandra, acted pro se.

The dissolution decree incorporated by reference a separation agreement entered into by the parties. The agreement provided for joint custody of the parties two children, Devon and Tyler, with Sandra as the domiciliary parent. Andrew received liberal visitation rights. Currently, Devon is four years old and Tyler is two. The issue on appeal concerns the District Court's modification of the original decree.

On January 8, 1987, Andrew petitioned to modify the joint custody. He alleged that modification of the decree would serve the children's best interest. After hearing the matter February 2, 1987, the District Court found that the children's present environment seriously endangered their health, and that their best interest would be served by modifying the decree to designate Andrew as the domiciliary parent.

Sandra petitioned for rehearing, and the District Court granted her petition but told the parties that the issues would be confined to new evidence and to facts showing the environment provided by Andrew's domicile. However, the transcript shows that evidence of the behavior of both parties prior to the order modifying the original decree was admitted at the rehearing. After the rehearing the lower

court found that Sandra failed to show that the children's present domicile at Andrew's home seriously endangered their health. The lower court also found that their best interest would be served by continuing Andrew as the domiciliary parent.

The only issue presented by Sandra on appeal is whether substantial evidence supports the lower court's orders. We reverse the first order and reinstate the custody arrangement from the first decree. Our reversal invalidates the second order, and we remand for proceedings detailed at the end of this opinion.

Andrew's petition for modification alleged that a change making him the domiciliary parent would serve the children's best interests because: (1) Sandra had failed to maintain employment, (2) Sandra had assumed a harmful lifestyle resulting in her inability to properly feed and clothe the children, and (3) Sandra boasted of her own use of cocaine.

The petition specified events occurring on the 7th, 14th, 15th, and 21st of November, 1986. On the 7th, according to Andrew, Sandra left Devon even though he had a fever. In the early morning hours of the 14th, and the 15th, according to Andrew who stayed at Sandra's apartment on these dates, drunken men awoke the household and used the residence to consume illegal drugs. On the 21st, Andrew alleged that Sandra travelled to Bozeman with a stripper and a bouncer for the purpose of either participating in or viewing an exotic dance show.

On the basis of Andrew's petition and affidavit the District Court granted Andrew's motion for an order to show cause hearing. The lower court scheduled the hearing for February 2, 1986, and on January 9, 1986, Sandra received

3

notice of the petition and the court's order scheduling the hearing.

Both parties appeared for the hearing. Andrew was once again represented by Smartt, the attorney who arranged for the original decree, and Sandra came to the hearing with attorney Michael R. Tramelli. Tramelli informed the District Court that Sandra had contacted him on Friday, January 30, 1987, to request his services for the hearing, but that he had informed Sandra that he would not take the case because there was not enough time for him to prepare. He also stated that Sandra had made a diligent effort to obtain an attorney prior to contacting him on January 30, but that no one would take the case pro bono. Tramelli then explained that he was appearing to request a continuance on behalf of Sandra, and Smartt stated that Andrew had no objection to a continuance. The District Court, however, denied the continuance because three witnesses had been subpoenaed and were present to testify for Andrew, and because, "If she can't get it [representation] in a week's time, when is she going to get it?" At that point Tramelli, admittedly unprepared, agreed to represent Sandra.

Andrew, the first witness, testified that Sandra had poor housekeeping skills, used drugs, and partied with dangerous characters who came to the house late at night. Andrew also produced photographs of the interior of Sandra's old apartment which showed piles of dirty laundry.

Two of Sandra's former roommates testified after Andrew. Both had lived with Sandra for approximately two months during the spring of 1986. The roommates corroborated Andrew's testimony concerning Sandra's poor housekeeping skills, partying lifestyle, and undesirable friends. They also believed that Sandra had a hard time holding a job.

4

Cindy Testerman, the first of the roommates to testify, stated that Sandra favored Tyler over Devon, and that she believed Sandra used illegal drugs but she had not seen Sandra use them. Ms. Testerman also stated that the few times she had seen Andrew with the children they interacted well together.

The other roommate, Jeanne Payseno, added that Sandra kept a mirror for sniffing cocaine, and that she had seen Sandra smoke marijuana on a few occasions. Ms. Payseno also testified that Sandra did not show enough affection for Devon; that sometimes Sandra would let Tyler cry rather than picking him up; and that when Sandra worked a night job and a day job, Ms. Payseno often had to get breakfast for Devon and Tyler. In regard to Sandra's social life, Ms. Payseno approved of some of Sandra's friends and disapproved of others. Ms. Payseno also testified that Sandra's boyfriend and other men had slept in Sandra's area of the apartment, and that Sandra's boyfriend helped care for the children.

Andrew's last witness was Teresa Koyna. Ms. Koyna testified that Sandra could be a good mother, but that Sandra sometimes failed to properly care for the children's needs. Ms. Koyna also testified that Sandra wrongly blamed Devon for bruises on Tyler's back, and that the children came to her house hungry on one occasion.

Following Ms. Koyna's testimony, the lower court told the parties that Andrew had shown that Sandra failed to properly care for the children. The lower court then asked Andrew's attorney how Andrew would care for the children. Andrew took the stand again and stated that children could not reside at his current domicile, but that if he were the domiciliary custodian he would obtain appropriate housing.

5

Following Andrew's concluding testimony, Sandra testified that Andrew and the witnesses called by Andrew spoke half truths in regard to her child rearing abilities; her lifestyle; her housekeeping skills; and her employment capabilities. As to her work skills she stated that she was currently employable as a medical secretary, and that she would be back at work when the hospital that had formerly employed her finished a construction project. She also stated that she had changed jobs because of illness and for career advancement rather than because she could not hold a job.

In regard to her housekeeping skills, she stated that her roommates contributed to the problems in the apartments where she had lived, and that she currently lived alone with her children in a clean environment. She also testified that her old roommates exaggerated the amount of time she spent away from the children; that only one person stayed over night with her during the period of time she lived with Ms. Payseno and Ms. Testerman; and that she no longer used drugs.

Sandra also testified that she loved the children equally but gave more affection to Tyler because Tyler needed it and Devon needed other things; the children received discipline equally; and that she had never physically abused the children. Sandra also admitted that once or twice she had been too drunk to drive the children from the baby-sitter's so she left them there.

On February 19, 1987, approximately two weeks after the hearing, the lower court ordered that Andrew assume the duty of the domiciliary parent. Sandra's petition for rehearing followed on February 25, 1987. The petition was amended at the request of the lower court to a petition for

remodification, and the lower court heard the issue on May 28, 1987.

Testimony by Sandra and Andrew at the second hearing focused on Andrew's past and present living situation, and revealed that: Andrew had physically abused Sandra in Devon's presence; Andrew had a drinking problem which once lead to Andrew passing out and leaving one of the children outside during the evening hours; Andrew took the children a few days after the lower court modified custody even though he did not have a home for the children; in addition to having no home for the children, Andrew did not have beds for the children, clothes for the children, or pots and pans to cook for the children; Sandra would not give Andrew the children's beds because she wanted them for her own visitation; while Andrew saved money to buy the necessities for providing a proper domicile for the children, the children and Andrew stayed with Teresa Koyna, one of Andrew's witnesses from the previous hearing, and the children slept in Andrew's bed; Teresa Koyna asked Andrew and the children to leave, and after leaving the Koyna residence the children spent most of their nights with Sandra; Sandra believed that Andrew was drunk recently when he came to get the children.

Andrew responded to Sandra's allegations with his own testimony and the testimony of an employee in the day care center where Andrew placed the children while working. Andrew did not deny physically abusing Sandra, nor did he deny leaving one of the children out in the cold when he was intoxicated. However, Andrew stated that he did not have a drinking problem. Andrew also stated and he was not drunk when he picked up the children recently, although he admitted to having a few beers at lunch that day. As to having a home for the children, Andrew stated he was unprepared to care for

the children at the time of modification because Sandra received all the necessary items for child rearing after the divorce. He also stated that he had acquired a suitable domicile and household items since the time of modification.

The day care worker testified that the children were doing better in day care with Andrew as the domiciliary parent than they had when Sandra was the domiciliary parent. The day care worker believed the improvement was due to the fact that the children had become more familiar with the center's routine because Andrew brought them to day care on a more regular basis than Sandra.

Testimony at the second hearing also concerned the ability of the parents to take care of the children's health and clothing needs. Each accused the other of being neglectful in this area. Following the hearing the lower court denied Sandra's petition on the grounds that Sandra had failed to show a change of circumstances which would justify modifying the already modified decree.

ISSUE

Did the District Court rely on substantial credible evidence in modifying the decree in its first order, and by refusing to modify the decree in its second order?

The lower court found that the present environment provided by Sandra's domicile seriously endangered the children's health, and that the harm likely to be caused by a change in the environment was outweighed by its advantages to the children. Sandra argues that this finding is not supported by substantial evidence. Andrew responds that substantial evidence supports the endangerment finding, and that the lower court's best interest finding is sufficient to support the modification made in the first order even if the

endangerment finding was not supported by substantial evidence.

The language in the endangerment finding in the first order mirrors the language in § 40-4-219(1)(c), MCA. The lower court apparently applied this statute to determine whether or not modification was proper.

Section 40-4-219(1)(a)-(f), MCA, lists the jurisdictional prerequisites for modification of a sole custody decree. Absent a proper finding of the presence of one of the circumstances listed in § 40-4-219(1)(a)-(f), MCA, a district court may not modify a prior award of sole custody.

In regard to joint custody, § 40-4-224(3), MCA, states that a joint custody decree may be terminated pursuant to § 40-4-219, MCA. However, a request for simply a different physical custody arrangement calls for application of § 40-4-224(2), which states in part that

> 'joint custody' means an order awarding custody of the minor child to both parents and providing that the physical custody and residency of the child shall be allotted between the parents in such a way as to assure the child frequent and continuing contact with both parents. The allotment of time between parties shall be as equal as possible; however, each case shall be determined according to its own practicalities with the best interest of the child as the primary consideration. (Emphasis added.)

In determining whether or not modification serves the child's best interest, district courts should proceed by making findings on the factors in § 40-4-212, MCA. See In re the Marriage of Bergner and Owens (Mont. 1986), 722 P.2d 1141, 1144, 43 St.Rep. 1285, 1289. And a district court facing a proposed change which may be properly characterized as a

9

modification rather than termination of joint custody may proceed directly to a best interest determination without finding the presence of one of the jurisdictional prerequisites. See In re the Marriage of Paradis (Mont. 1984), 689 P.2d 1263, 1265, 41 St.Rep. 2041, 2043.

However, where modification equates to termination of the joint custody, the lower court should proceed according to the requirements of § 40-4-219, MCA. See In re the Marriage of Gahm and Henson (Mont. 1986), 722 P.2d 1138, 1140, 43 St.Rep. 1281, 1283. In Gahm, the petitioner requested an award of permanent custody with limited visitation for the respondent. The District Court concluded that the requested modification amounted to termination of the joint custody and found that the petitioner had failed to satisfy the serious endangerment jurisdictional prerequisite for modifying a custody decree as required by the facts of the case, and by § 40-4-219(1)(c), MCA. We affirmed. Gahm, 722 P.2d at 1140.

Andrew argues that Paradis applies and that under Paradis the District Court's endangerment finding is not necessary to support the first modification. Sandra argues that the Gahm rationale applies and thus the endangerment finding was a jurisdictional prerequisite.

We agree with Sandra's assertion that the lower court's modification amounted to termination of the parties' joint custody arrangement. The modified decree awarded physical custody to Andrew and granted Sandra reasonable visitation conditioned on reasonable prior notice and abstention from alcohol. This was a significant change for the children. The original decree granted Sandra physical custody and Andrew received liberal visitation rights. Under the old custody arrangement Andrew had neither integrated the

children into his home, nor had he prepared to assume the duties of the children's physical custodian once modification occurred. Under these circumstances, the lower court's modification terminates the joint custody established by the first decree because the change amounts to "more than a request for a different physical custody arrangement like the request in Paradis and does not concern the integration standard." Gahm, 722 P.2d at 1140. And where "one parent seeks to become permanent custodian and to relegate the other parent to limited visitation, the proposed arrangement is no longer joint custody." Gahm, 722 P.2d at 1141. Thus we hold that § 40-4-219, MCA, applies, and we reverse for lack of a proper endangerment finding.

The part of § 40-4-219, MCA, relevant to resolution of this appeal reads:

> Modification. (1) The court may in its discretion modify a prior custody decree if it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child and if it further finds that:
>
> . . .
>
> (c) the child's present environment endangers seriously his physical, mental, moral, or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him.

The lower court's finding from the first hearing in regard to endangerment of the children is based on the testimony documenting Sandra's poor housekeeping skills. These findings are supported by substantial evidence, but

11

they concern the environment Sandra provided long prior to the hearing date. The lower court also found Sandra's lifestyle led to neglect of the children, and their moral decline. Several findings in this regard are not supported by substantial evidence.

The lower court made no findings concerning the adequacy of Sandra's domicile at the time of the hearing, or the potential for harm to the children posed by Sandra's current domicile and lifestyle. Andrew presented no evidence showing that the domicile provided by Sandra at the time of the first hearing endangered the children. The only evidence in this regard is Sandra's testimony that her home was clean and that the children were well cared for.

The lower court also failed to adequately weigh Sandra's deficiencies against the harm likely to be caused by granting physical custody to a parent who was unprepared to assume domiciliary duties. Under the facts of this case, the language in § 40-4-219, MCA, mandates findings relevant to these issues.

We will not disturb trial court findings which are based on substantial though conflicting evidence. In re the Marriage of Sarsfield (1983), 206 Mont. 397, 411, 671 P.2d 595, 603. However, the party requesting modification under § 40-4-219, MCA, bears a heavy burden because the statute's policy is to "preserve stability and continuity of custody for the children." Gahm, 722 P.2d at 1140.

In this case, the failure to address the children's present environment, and failure to adequately consider the harmful effects of a change in this environment, constitutes error. We reverse, reinstate the original decree, and remand for the lower court to consider the issue presented by Andrew's petition for a second time.

12

However, in further proceedings the lower court should not apply § 40-4-219, MCA, if the children have been integrated into Andrew's home since the first modification. If such is the case, the lower court should proceed to a determination of a joint custody arrangement reflecting the children's best interest keeping in mind the policies set out in § 40-4-224(2), MCA, and the factors in § 40-4-212, MCA. In regard to the parties' stipulation concerning visitation, we request that the lower court reconsider such stipulation on remand when it once again has jurisdiction.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

13